UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

DAVID PEREZ,

       Plaintiff,

v.                           Case No. 3:19-cv-880-MMH-MCR

JUSTIN ANDERSON, et al.,

       Defendants.

_____

## **ORDER**

### **I. Status**

Plaintiff David Perez, an inmate of the Florida penal system, initiated

this action by filing a Civil Rights Complaint (Doc. 1).[1] Perez is proceeding on

a Second Amended Complaint (Doc. 94). In the Second Amended Complaint,

Perez asserts claims pursuant to 42 U.S.C. § 1983 against Sheriff Robert

Hardwick of the St. Johns County Sheriff's Office (SJCSO) as well as SJCSO

Sergeant[2] Ryan Smith and five SJCSO Deputies: Richard Thurmond, Craig

Maguire, Justin Anderson, Jonas Carballosa, and Matthew Bellamy.[3] See

_____

[1] For all documents filed in this case, the Court cites to the document and page numbers as assigned by the Court's Electronic Case Filing System.

[2] Although the parties refer to Smith as Captain Smith at times in their briefing and exhibits, Smith testified that he was a sergeant in SJCSO's narcotics unit at the time of Perez's arrest. See Deposition of Ryan Smith (Doc. 133-3; Smith Dep.) at 26.

[3] Perez voluntarily dismissed his claims against two other Defendants: St.

Second Amended Complaint at 2-5. In the Second Amended Complaint, Perez contends Defendants violated his Fourth Amendment rights in the course of his February 2, 2017 arrest in St. Augustine, Florida. Id. at 5-12. Perez also raises state law battery claims. Id. at 11-13. As relief, Perez requests monetary damages. Id. at 5-13.

This matter is before the Court on the following motions: (1) Motion for Summary Judgment by Bellamy and Gillis (Doc. 131; Bellamy's Motion) with exhibits; (2) Motion for Summary Judgment by Richard Thurmond (Doc. 132; Thurmond's Motion) with exhibits; (3) Motion for Summary Judgment by Carballosa, Maguire, Anderson, and Smith (Doc. 133; Joint Motion) with exhibits; and (4) Sheriff Hardwick's Motion for Summary Judgment (Doc. 134; Sheriff's Motion) with exhibits.[4] Perez filed responses in opposition to each of the Motions. See Plaintiff's Response in Opposition to Defendants' Carballosa, Maguire, Anderson and Smith's Motion for Summary Judgment (Doc. 136; Joint Motion Response); Plaintiff's Response in Opposition to Defendant Richard Thrumond's [sic] Motion Summary Judgment (Doc. 137; Thurmond Response); Plaintiff's Response in Opposition to Defendant Bellamy's Motion

_____

Johns County and Vanessa Gillis. See Docs. 113, 152.

[4] The Court advised Perez of the provisions of Federal Rule of Civil Procedure 56, notified him that the granting of a motion for summary judgment would represent a final adjudication of this case which may foreclose subsequent litigation on the matter, and gave him an opportunity to respond to the Motions. See Summary Judgment Notice (Doc. 135).

for Summary Judgment (Doc. 138; Bellamy Response); Plaintiff's Response in Opposition to Defendant Sheriff Hardwick's Motion Summary Judgment (Doc. 143; Sheriff Response). He also submitted exhibits with each response. See Docs. 136-1 through 136-9; Docs. 137-1 through 137-8; Docs. 138-1 through 138-9; Docs. 143-1 through 143-12. Defendants filed reply briefs. See Deputy Thurmond's Reply to Plaintiff's Response in Opposition (Doc. 140; Thurmond Reply); Bellamy and Gillis' Reply to Plaintiff's Response in Opposition (Doc. 141; Bellamy Reply); Deputies Carballosa, Maguire, Anderson, and Smiths' Reply to Plaintiff's Response in Opposition (Doc. 142; Joint Motion Reply) with exhibit (Doc. 142-1); Sheriff Hardwick's Reply to Plaintiff's Response in Opposition (Doc. 146; Sheriff Reply). The Motions are ripe for review.

## II. Summary Judgment Standard

Under Rule 56 of the Federal Rules of Civil Procedure (Rule(s)), "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The record to be considered on a motion for summary judgment may include "depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions,

interrogatory answers, or other materials." Fed. R. Civ. P. 56(c)(1)(A).[5] An issue is genuine when the evidence is such that a reasonable jury could return a verdict in favor of the non-moving party. Mize v. Jefferson City Bd. of Educ., 93 F.3d 739, 742 (11th Cir. 1996) (quoting Hairston v. Gainesville Sun Publ'g Co., 9 F.3d 913, 919 (11th Cir. 1993)). "[A] mere scintilla of evidence in support of the non-moving party's position is insufficient to defeat a motion for summary judgment." Kesinger ex rel. Estate of Kesinger v. Herrington, 381 F.3d 1243, 1247 (11th Cir. 2004) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986)).

The party seeking summary judgment bears the initial burden of demonstrating to the court, by reference to the record, that there are no

---

[5] Rule 56 was revised in 2010 "to improve the procedures for presenting and deciding summary-judgment motions." Rule 56 advisory committee's note 2010 Amends.

> The standard for granting summary judgment remains unchanged. The language of subdivision (a) continues to require that there be no genuine dispute as to any material fact and that the movant be entitled to judgment as a matter of law. The amendments will not affect continuing development of the decisional law construing and applying these phrases.

Id. "[A]lthough the interpretations in the advisory committee['s] notes are not binding, they are highly persuasive." Campbell v. Shinseki, 546 F. App'x 874, 879 n.3 (11th Cir. 2013). Thus, case law construing the former Rule 56 standard of review remains viable.

In citing to Campbell, the Court notes that it does not rely on unpublished opinions as binding precedent; however, they may be cited in this Order when the Court finds them persuasive on a particular point. See McNamara v. GEICO, 30 F.4th 1055, 1060-61 (11th Cir. 2022); see generally Fed. R. App. P. 32.1; 11th Cir. R. 36–2 ("Unpublished opinions are not considered binding precedent, but they may be cited as persuasive authority.").

genuine issues of material fact to be determined at trial. See Clark v. Coats & Clark, Inc., 929 F.2d 604, 608 (11th Cir. 1991). "When a moving party has discharged its burden, the non-moving party must then go beyond the pleadings, and by its own affidavits, or by depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." Jeffery v. Sarasota White Sox, Inc., 64 F.3d 590, 593-94 (11th Cir. 1995) (internal citations and quotation marks omitted). Substantive law determines the materiality of facts, and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Anderson, 477 U.S. at 248. In determining whether summary judgment is appropriate, a court "must view all evidence and make all reasonable inferences in favor of the party opposing summary judgment." Haves v. City of Miami, 52 F.3d 918, 921 (11th Cir. 1995) (citing Dibrell Bros. Int'l, S.A. v. Banca Nazionale Del Lavoro, 38 F.3d 1571, 1578 (11th Cir. 1994)). "Summary judgment is improper, however, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Guevara v. NCL (Bahamas) Ltd., 920 F.3d 710, 720 (11th Cir. 2019) (quotation marks and citation omitted).

### III. Background

On February 2, 2017, law enforcement arrested Perez during a "drug stop" in the parking lot of an outlet mall located in St. Augustine, Florida. See

5

Second Amended Complaint at 5. The circumstances that led to the drug stop and how the arrest itself unfolded are largely disputed by the parties. Because there is no body camera footage or other recording of Perez's arrest,[6] the description of events set forth below is derived from the parties' deposition testimony. The Court will summarize the testimony of the Defendants before turning to that of Perez.

**A. Defendants' Description of Events**

During the course of a drug trafficking investigation, a confidential informant (CI) told Deputy Thurmond that Perez was a "higher level dealer" who was allegedly obtaining drugs from the Dominican Republic for distribution and sale in Florida. See Deposition of Richard Thurmond (Doc. 132-1; Thurmond Dep.) at 44-45. On February 2, 2017, Deputy Thurmond directed the CI to contact Perez and arrange a controlled buy of three ounces of heroin. Id. at 19. Perez agreed to the sale, but asked the CI to pick him up in Orlando and drive him to St. Augustine where the sale would take place. Id. The CI drove his personal vehicle to pick Perez up in Orlando. See Smith Dep. at 63-65. There, Perez told the CI that his minor son would be accompanying them. Id. An undercover SJCSO detective, who is not a named defendant in this lawsuit, followed the CI's vehicle to and from Orlando. Id. at 65-66. Once

---

[6] At the time of Perez's arrest, SJCSO did not have body camera technology. See Smith Dep. at 35.

the CI returned to St. Augustine with Perez and his son, the officers instructed the CI to drive to an outlet mall and park next to an empty undercover vehicle at the back end of the outlet mall's parking lot. Id. at 68.

According to Sergeant Smith, law enforcement had two take-down vehicles waiting at the mall. Inside the primary take-down vehicle were Sergeant Smith, who was driving, and Deputies Maguire, Carballosa, and Bellamy. See Smith Dep. at 72-73. Deputy Anderson was in the secondary take-down vehicle. Id. Deputy Thurmond himself was initially stationed in an undercover car at a gas station near the interstate. See Thurmond Dep. at 24-25. After the CI exited the interstate to head towards the outlet mall, Deputy Thurmond left the gas station and began following the CI. See Thurmond Dep. at 25. Deputy Thurmond eventually stopped his vehicle at a distance – approximately the length of a football field – away from where the CI parked. Id. at 33-34, 46.

As soon as the CI parked his vehicle in the designated spot, Sergeant Smith initiated the take-down by pulling up directly behind the CI's vehicle, thereby effectively pinning in the CI's vehicle. See Smith Dep. at 86; Deposition of Matthew Bellamy (Doc. 131-1; Bellamy Dep.) at 26. Sergeant Smith also activated the primary take-down vehicle's police lights and sirens. See Smith Dep. at 86. According to Sergeant Smith, Perez immediately jumped out of the

CI's vehicle and began to flee towards a retention pond that was located adjacent to the parking lot. Id. at 97-101.

Deputy Maguire exited the primary take-down vehicle and began chasing after Perez. See Smith Dep. at 99; Bellamy Dep. at 29. Deputy Maguire testified that he announced "Sheriff's Office" and issued Perez commands to stop, but Perez continued running towards the water. See Deposition of Craig Maguire (Doc. 133-6; Maguire Dep.) at 42. Deputy Maguire reached Perez and tackled him from behind, but injured himself in the process. See Maguire Dep. at 42, 52-56; see also Maguire Supplemental Narrative (Doc. 133-16). Perez escaped the tackle and began running towards the pond again. See Maguire Dep. at 58. Deputy Maguire testified that he observed Perez throw a plastic bag into the water. Id. Perez then turned back towards Deputy Maguire, and Deputy Maguire tackled Perez a second time. Id. Both Deputy Maguire and Perez fell to the ground near the water's edge, which caused Deputy Maguire to re-injure himself. Id. at 58-60; see also Doc. 133-16. Perez got up and began to flee again. See Maguire Dep. at 58-59. Seeing that other officers were approaching to assist with securing Perez, Deputy Maguire testified that he stopped his pursuit of Perez and instead swam into the water to retrieve the plastic bag. Id. at 66, 71-72.

After Perez's son and the CI were secured, Deputy Carballosa, Deputy Anderson, and Sergeant Smith testified that they headed in the direction in

which Perez had fled. See Deposition of Jonas Carballosa (Doc. 133-4; Carballosa Dep.) at 20; Smith Dep. at 98. Deputy Bellamy testified that he remained in the parking lot with Perez's son. See Bellamy Dep. at 29-31; Cf. Carballosa Dep. at 18, 34-36 (testifying that Deputy Bellamy also pursued Perez and was physically involved in the deputies' efforts to secure Perez); Cf. Deposition of Justin Anderson (Doc. 133-5; Anderson Dep.) at 40-41 (testifying that he only saw Deputy Maguire pursue Perez before he and Deputy Carballosa ran over to assist with securing Perez).

Upon reaching the area where Perez and Deputy Maguire were, Deputy Anderson testified that he announced himself as being with the Sheriff's Office and directed Perez to "stop resisting[] [and] get on the ground." Anderson Dep. at 55. He then "attempted to secure [Perez] in handcuffs by taking one of [Perez's] arms and putting it behind his back." Id. at 53. According to Deputy Anderson, Perez did not comply with his directives and attempted to pull away. Id. at 55-57. Deputy Anderson then performed a leg sweep to get Perez on the ground. Id. at 56-59; See also id. at 58-59 (describing a leg sweep as a law enforcement tactic whereby officers remove a suspect's "standing base by sweeping their . . . legs out from underneath them and placing the[] suspect on the ground"). Deputy Anderson testified in his deposition that Perez continued to resist by striking Deputy Anderson with his elbows. Id. at 60-61. Deputy Anderson performed knee strikes to Perez's right thigh. Id. at 65; See also id.

at 63 (describing a knee strike as a law enforcement technique whereby the officer takes his/her knee and strikes the "common peroneal or the meaty thigh area of an individual."). Because Perez continued trying to push himself up to a seated or standing position, Deputy Anderson performed a scapula strike. <u>Id.</u> at 66 (describing a scapula strike as a "hammer fist to the scapula area of the body"). As he and Perez continued to struggle, Deputy Anderson testified that he noticed Perez seemed to be attempting to retrieve something from his waistband. <u>Id.</u> at 67. At this point, Deputy Anderson testified he performed a brachial stun. <u>Id.</u> at 67-68 (describing a brachial stun as a technique where the officer strikes "the side of the neck into the shoulder area with a hammer fist, open hand or forearm strike in order to cause a pause in the fight with the suspect.").

When Sergeant Smith reached Perez, he saw Deputy Maguire sitting near the water, and Deputies Anderson and Carballosa physically struggling with Perez. <u>See</u> Smith Dep. at 104. Sergeant Smith testified that he heard Deputies Anderson and Carballosa give Perez repeated commands to stop resisting. <u>Id.</u> at 106. According to Sergeant Smith, Deputies Anderson and Carballosa were "basically in combat" with Perez, who was "physically resisting, shoving, [and] trying to defeat" them. <u>Id.</u> Sergeant Smith stated:

> I remember seeing them [Deputies Anderson and Carballosa] trying to pull him back to the ground to get control . . . [Perez] had one handcuff on one wrist

> not connected to the other one. So it was kind of
> flopping around. And he was – like as [the Deputies]
> would attempt to grab his arm, he was just moving –
> he was defeating that motion. So as they would
> attempt to grab him, he would . . . move away and
> move his arm and not let them take him into custody.

Id. at 108. Sergeant Smith testified he approached Perez from behind and applied a vascular neck restraint for approximately thirty seconds until he felt Perez stop resisting.[7] Id. at 111-12, 119; See Carballosa Dep. at 22 (testifying that he saw Perez lose consciousness when the vascular neck restraint was applied). Sergeant Smith then attempted to handcuff Perez, but Perez regained consciousness. See Smith Dep. at 120. After Perez regained consciousness, Deputy Carballosa testified Perez kicked him as he tried to stand up. See Carballosa Dep. at 33, 43-44. Deputy Carballosa then struck Perez's face two or three times, which caused Perez to pause long enough that they were able to place him in handcuffs. See Smith Dep. at 120-21; Carballosa Dep. at 22, 34.

## B. Perez's Description of Events

Perez tells a markedly different story about the encounter. Perez testified that he and the CI were en route to Daytona to work on a construction project when he was arrested on February 2, 2017. See Deposition of David

---

[7] While the vascular neck restraint technique was allowed at the time of Perez's arrest, Sergeant Smith testified that SJCSO stopped using the technique sometime after 2020. See Smith Dep. at 144. SJCSO's vascular neck restraint policy described the technique as "a physical restraint compressing certain veins and arteries in the neck to cause a subject to lose consciousness for a brief period of time." Id. at 130.

Perez (Doc. 133-7; Perez Dep.) at 20-23. According to Perez, they only stopped at the outlet mall in St. Augustine because the CI needed to switch vehicles with his wife. Id. at 25. After parking his vehicle near a pond, Perez testified the CI took a fishing pole out of the car trunk and told Perez he was going to fish until his wife arrived. Id. at 26. Perez testified that he and his son had just exited the CI's vehicle when they saw the police arrive. Id.

According to Perez, it was the CI, and not him, who fled the scene when the officers arrived. Id. at 26, 28, 31. Perez denied ever resisting or fighting with the officers. Id. at 31, 38. He further denied possessing or selling heroin, and maintained that he did not throw anything in the pond. Id. at 17, 19, 31. Perez testified that the officers placed him in handcuffs, threw him to the ground, and repeatedly hit him to the point where he feared for his life. Id. at 37-38. Perez testified that the officers beat him while he was handcuffed because they were trying to convince him to become a confidential informant. Id. at 37-38, 43-44. Perez identified Deputies Carballosa and Thurmond as having hit him; Perez stated there were three other deputies involved in his arrest, but he did not know their names. Id. at 44-45.

## C. Post-Arrest

After Perez was taken into custody, EMS arrived at the scene and examined Perez. A paramedic who examined Perez at the scene testified that Perez had a small cut on his left cheek with no active bleeding and two small

abrasions on his right cheek. <u>See</u> Deposition of Joshua Lawlor (Doc. 133-8; Lawlor Dep.) at 18. The paramedic testified that Perez reported he had no injuries and refused transportation to the hospital. <u>Id.</u> at 23, 32. Later that evening, officers took Perez to the emergency room for medical clearance. <u>See</u> Deposition of Dr. Christopher Schirmer (Doc. 133-9; Schirmer Dep.) at 9. Upon arrival in the emergency room, Perez complained of back pain, chest pain, abdominal and knee pain. <u>Id.</u> The emergency room physician testified that he found no signs of significant trauma during his examination of Perez, and therefore, medically cleared Perez for release to the jail. <u>Id.</u> at 59.

As a result of his February 2, 2017 arrest, a jury convicted Perez in state court of three offenses: (1) trafficking in heroin (more than 28 grams to less than 30 kilograms) in violation of Florida Statutes § 893.135; (2) resisting an officer without violence in violation of Florida Statutes § 843.02; and (3) child neglect in violation of Florida Statutes § 827.03. <u>See</u> Doc. 142-1; <u>State of Florida v. David Perez</u>, 2017-CF-181 (7th Cir. Ct. Mar. 29, 2018).

## IV. The Second Amended Complaint

Perez raises five claims in the Second Amended Complaint. As Count I, Perez asserts Sergeant Smith and Deputies Maguire, Carballosa, Anderson, and Thurmond used excessive force during his arrest in violation of the Fourth Amendment. <u>See</u> Second Amended Complaint at 7-8. In Count II, Perez asserts a failure to intervene claim under the Fourth Amendment against Deputies

Bellamy and Thurmond.[8] Id. at 8-10. As Count III, Perez asserts a municipal liability claim against Sheriff Hardwick in his official capacity. Id. at 10-11. And in Counts IV and V, Perez asserts battery claims under Florida law against Sergeant Smith, Deputies Thurmond, Carballosa, Maguire, and Anderson, as well as Sheriff Hardwick in his official capacity. Id. at 11-13.

As a preliminary matter, the Court finds that the Second Amended Complaint constitutes an impermissible "shotgun pleading." One category of "shotgun pleading" encompasses a complaint that contains "multiple counts where each count adopts the allegations of all preceding counts, causing each successive count to carry all that came before and the last count to be a combination of the entire complaint." See Weiland v. Palm Beach Cnty.

---

[8] In Counts I and II, Perez also asserts Fourteenth Amendment claims "to the extent any of [his] allegations occurred after the 'arrest' and therefore preclude application of the Fourth Amendment." See Second Amended Complaint at 7, 9 (emphasis removed). However, the summary judgment record establishes that Perez's excessive force, failure to intervene, and municipal liability claims are premised entirely on events that occurred during his arrest. As such, Perez's claims in Counts I and II must be analyzed under the Fourth Amendment rather than the Fourteenth Amendment. According to the Supreme Court:

> all claims that law enforcement officers have used excessive force—deadly or not—in the course of an arrest, investigatory stop, or other "seizure" of a free citizen should be analyzed under the Fourth Amendment and its "reasonableness" standard, rather than under a "substantive due process" approach. Because the Fourth Amendment provides an explicit textual source of constitutional protection against this sort of physically intrusive governmental conduct, that Amendment, not the more generalized notion of "substantive due process," must be the guide for analyzing these claims.

Graham v. Connor, 490 U.S. 386, 395 (1989).

Sheriff's Office, 792 F.3d 1313, 1321 & n.11 (11th Cir. 2015) (collecting cases).[9]
As a result, "most of the counts . . . contain irrelevant factual allegations and
legal conclusions." Strategic Income Fund, LLC v. Spear, Leeds & Kellog Corp.,
305 F.3d 1293, 1295 (11th Cir. 2002). In the Eleventh Circuit, shotgun
pleadings of this sort are "altogether unacceptable." Cramer v. State of Fla.,
117 F.3d 1258, 1263 (11th Cir. 1997); see also Cook v. Randolph Cnty., 573
F.3d 1143, 1151 (11th Cir. 2009) ("We have had much to say about shotgun
pleadings, none of which is favorable.") (collecting cases). Although Perez
improperly incorporates the allegations of each preceding count into each
successive count, he does not rely on the allegations of the preceding counts to
support his claims. Instead Perez appears to rely solely on the factual

---

[9] In Weiland, the Eleventh Circuit "identified four rough types or categories of
shotgun pleadings." See Barmapov v. Amuial, 986 F.3d 1321, 1324-25 (11th Cir. 2021)
(quoting Weiland, 792 F.3d at 1321). As the Barmapov court explained,

> The first [category] is "a complaint containing multiple
> counts where each count adopts the allegations of all
> preceding counts, causing each successive count to carry all
> that came before and the last count to be a combination of
> the entire complaint." The second is a complaint "replete
> with conclusory, vague, and immaterial facts not obviously
> connected to any particular cause of action." The third is a
> complaint that does not separate "each cause of action or
> claim for relief" into a different count. And the final type of
> shotgun pleading is a complaint that "assert[s] multiple
> claims against multiple defendants without specifying
> which of the defendants are responsible for which acts or
> omissions, or which of the defendants the claim is brought
> against."

Barmapov, 986 F.3d at 1324-25 (quoting Weiland, 792 F.3d at 1321-23).

allegations set forth in paragraphs 1 – 25 in support of each of his claims. And it appears that Defendants had no problem understanding the nature of Perez's claims or responding to them. As such, given the late stage of this proceeding, the Court will cure the shotgun nature of the Second Amended Complaint rather than ordering a repleader. The Court will strike Perez's incorporation of allegations in the preceding counts and correct the incorporation by reference allegation in each count to incorporate only the factual allegations set forth in paragraphs 1 – 25 of the Second Amended Complaint. The Court will further direct the Clerk of the Court to file the Corrected Second Amended Complaint on the Court's docket and it will remain the operative pleading. Defendants need not respond to the Corrected Second Amended Complaint. Their prior Answers will stand as their responses.

## V. Summary of the Parties' Arguments

In Bellamy's Motion, Deputy Bellamy seeks entry of summary judgment on the basis that (1) he is entitled to qualified immunity, and (2) Perez has failed to present facts establishing that Deputy Bellamy observed any alleged use of force or that he was in a position to intervene. See Bellamy's Motion at 1-3, 5-9. Deputy Thurmond similarly argues that (1) he is entitled to qualified immunity and that (2) he neither observed the alleged use of force nor was in a position to intervene. See Thurmond's Motion at 6-9, 12-13. Deputy Thurmond also contends that he is entitled to summary judgment because the

16

undisputed material facts establish that he did not deprive Perez of his right to be free from excessive force. See id. at 9-12.

In their Joint Motion, Sergeant Smith and Deputies Maguire, Anderson, and Carballosa argue that they are entitled to the entry of summary judgment because (1) the undisputed material facts establish they did not deprive Perez of his right to be free from excessive force, and (2) they are entitled to qualified immunity. See Joint Motion at 18-24. In addition, they argue that summary judgment is proper on Perez's state law battery claim because the undisputed facts establish that their use of force was reasonable under the circumstances and further, Perez cannot overcome the presumption of good faith. See id. at 24-25.

In the Sheriff's Motion, Sheriff Hardwick argues that he is entitled to summary judgment because (1) the undisputed facts establish he did not deprive Perez of his right to be free from excessive force and (2) Perez has failed to establish "the existence of an unconstitutional custom or policy that was the moving force behind any alleged constitutional deprivation." See Sheriff's Motion at 20-23. Sheriff Hardwick also asserts that he is entitled to summary judgment on the battery claim because the undisputed facts establish that the alleged use of force was reasonable and Perez cannot overcome the presumption of good faith. Id. at 24-25.

In response, Perez primarily argues that summary judgment is not warranted as to any of his claims because there are disputed issues of material fact. See Joint Motion Response at 7-12, 16-20; Thurmond Response at 7-12, 17-19; Bellamy Response at 7-13, 17-19; Sheriff Response at 8-13.

In their Joint Reply, Sergeant Smith and Deputies Maguire, Anderson, and Carballosa contend their use of force was objectively reasonable under the circumstances because "[i]t is undisputed that [Perez] resisted arrest and struggled with the Deputies." See Joint Motion Reply at 2. They further argue that Perez has failed to meet his burden of establishing that they are not entitled to qualified immunity. Id. at 4-5. Deputies Bellamy and Thurmond likewise argue in their Replies that Perez has failed to meet his burden of showing that they are not entitled to qualified immunity. See Bellamy Reply at 2-6; Thurmond Reply at 1-5. Sheriff Hardwick argues in his Reply that Perez has not provided evidence of a failure to train and further, that the level of force applied to secure Perez's arrest was reasonable. See Sheriff Reply at 2-6.

## VI. Analysis

The doctrine of "[q]ualified immunity protects from civil liability government officials who perform discretionary functions if the conduct of the officials does not violate 'clearly established statutory or constitutional rights of which a reasonable person would have known.'" Nolin v. Isbell, 207 F.3d 1253, 1255 (11th Cir. 2000) (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818

(1982)). As a result, this defense protects from suit "'all but the plainly incompetent or those who knowingly violate the law.'"[10] <u>Mullenix v. Luna</u>, 577 U.S. 7, 12 (2015) (quoting <u>Malley v. Briggs</u>, 475 U.S. 335, 341 (1986)); <u>Carr v. Tatangelo</u>, 338 F.3d 1259, 1266 (11th Cir. 2003). Indeed, as "'[g]overnment officials are not required to err on the side of caution,' qualified immunity is appropriate in close cases where a reasonable officer could have believed that his actions were lawful[.]" <u>Lee v. Ferraro</u>, 284 F.3d 1188, 1200 (11th Cir. 2002) (quoting <u>Marsh v. Butler Cnty.</u>, 268 F.3d 1014, 1031 n.8 (11th Cir. 2001)).

To be entitled to qualified immunity, a defendant bears the initial burden of showing that his conduct was within the scope of his discretionary authority. <u>See</u> <u>Webster v. Beary</u>, 228 F. App'x 844, 848 (11th Cir. 2007); <u>Lee</u>, 284 F.3d at 1194. Here, it is undisputed that, at all times material to this case, Defendants were acting within the scope of their discretionary authority.[11]

---

[10] In determining whether a defendant is entitled to qualified immunity, courts view the facts and all reasonable inferences in the light most favorable to the plaintiff to the extent supported by the record, and then consider "the legal issue of whether the plaintiff's 'facts,' if proven, show that the defendant violated clearly established law." <u>Priester v. City of Riviera Beach</u>, 208 F.3d 919, 925 n.3 (11th Cir. 2000); <u>Scott v. Harris</u>, 550 U.S. 372, 381 n.8 (2007).

[11] "'A government official acts within [his] discretionary authority if the actions were (1) undertaken pursuant to the performance of [his] duties and (2) within the scope of [his] authority.'" <u>Jones v. City of Atlanta</u>, 192 F. App'x 894, 897 (11th Cir. 2006) (per curiam) (quoting <u>Lenz v. Winburn</u>, 51 F.3d 1540, 1545 (11th Cir. 1995)). Making an arrest is thus a discretionary function for a police officer. <u>See</u> <u>Crosby v. Monroe Cnty.</u>, 394 F.3d 1328, 1332 (11th Cir. 2004); <u>see also</u> <u>Lee</u>, 284 F.3d at 1194 (finding that "there can be no doubt that [the officer] was acting in his discretionary

Accordingly, the burden shifts to Perez to demonstrate that qualified immunity is not appropriate using the test established by the Supreme Court in Saucier v. Katz, 533 U.S. 194, 201 (2001).

In accordance with Saucier, the Court must ask whether the facts viewed in the light most favorable to Perez "show the [Defendants'] conduct violated a constitutional right[.]" Id.; see also Hope v. Pelzer, 536 U.S. 730, 736 (2002); Beshers v. Harrison, 495 F.3d 1260, 1265 (11th Cir. 2007) (quoting Scott, 550 U.S. at 377). The Court must also ask whether the right allegedly violated was clearly established at the time of the violation. Hope, 536 U.S. at 739; Saucier, 533 U.S. at 201; Scott, 550 U.S. at 377; Underwood v. City of Bessemer, 11 F.4th 1317, 1328 (11th Cir. 2021) ("[W]e ask two questions: (1) whether the facts that a plaintiff has alleged or shown make out a violation of a constitutional right, and (2) if so, whether the right at issue was clearly established at the time of the defendant's alleged misconduct") (internal quotations omitted). The Court may consider these questions in whichever order it chooses, and qualified immunity will protect the defendant if the answer to either question is "no." Pearson v. Callahan, 555 U.S. 223, 232, 236 (2009)[12]; Underwood, 11 F.4th at 1328.

_____

capacity when he arrested [the plaintiff]," even though the plaintiff asserted that the officer used excessive force in the manner in which he was arrested).

[12] In Pearson, the Supreme Court modified the procedure mandated in Saucier giving courts the discretion to determine which prong of the qualified immunity

## A. Perez's Fourth Amendment Excessive Force Claims

The Fourth Amendment's guarantee against unreasonable searches and seizures includes the right to be free from the excessive use of force during the course of an arrest. See Oliver v. Fiorino, 586 F.3d 898, 905 (11th Cir. 2009). "In excessive force cases, whether a plaintiff's constitutional rights were violated is governed by the Fourth Amendment's objective reasonableness standard." Johnson v. City of Miami Beach, 18 F.4th 1267, 1272 (11th Cir. 2021) (citing Hadley v. Gutierrez, 526 F.3d 1324, 1329 (11th Cir. 2008)). Under that standard, courts examine an officer's use of force "on a case-by-case basis from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." Johnson, 18 F.4th at 1272 (quoting Brown v. City of Huntsville, 608 F.3d 724, 738 (11th Cir. 2010).

To determine whether an officer used excessive force under an objective-reasonableness standard, "courts examine the totality of the circumstances, 'including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether [the suspect] is actively resisting arrest or attempting to evade arrest by flight.'" Baker v. City of Madison, Ala., 67 F.4th 1268, 1279 (11th Cir. 2023) (quoting Graham, 490 U.S. at 396). "Other considerations are the need for the

---

analysis should be resolved first. See Pearson, 555 U.S. at 236.

application of force, the relationship between the need and the amount of force used, the extent of the injury inflicted, and whether the force was applied in good faith or maliciously and sadistically." Id. (citing Hadley, 526 F.3d at 1329). "[T]his multifactor analysis entails an assessment of the totality of the circumstances." Acosta v. Miami-Dade Cnty., 97 F.4th 1233, 1239 (11th Cir. 2024) (internal citations omitted). Ultimately, "[t]he calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." Graham, 490 U.S. at 396-97. The Eleventh Circuit has instructed that:

> a police officer violates the Fourth Amendment if he uses gratuitous force against a suspect who is secure, not resisting, and not a safety threat to the officer or other officers. See, e.g., Hadley, 526 F.3d at 1330 (holding officer used excessive force when, in a single blow, he punched suspect who was handcuffed and was not struggling or resisting); Lee, 284 F.3d at 1199 (holding that an officer's use of force after the plaintiff was "arrested, handcuffed, and completely secure, and after any danger to the arresting officer as well as any risk of flight had passed" was excessive). Conversely, we have held that it may be reasonable for an officer to use force against a suspect who is resisting and not subdued. See, e.g., Mobley v. Palm Beach Cnty. Sheriff Dep't, 783 F.3d 1347, 1351, 1355 (11th Cir. 2015) (concluding officers' use of force in striking, kicking, and tasing suspect was not excessive where the suspect, though pinned on the ground, was "refusing to surrender his hands to be cuffed"); Crosby v. Monroe

> Cnty., 394 F.3d 1328, 1334-35 (11th Cir. 2004)
> (concluding officer's use of force was not excessive
> where suspect, though lying face down on the ground,
> "was able to wrestle his hand loose and push [the
> officer's] foot away").

Johnson, 18 F.4th at 1272-73.

In this case, Sergeant Smith and Deputies Maguire, Anderson and Carballosa each acknowledge having used force to secure Perez's arrest. The deposition testimony of these officers reflects that during the course of their encounter with Perez: Deputy Maguire tackled Perez twice; Deputy Anderson performed a leg sweep, several knee strikes, a brachial stun, and a scapula strike; Sergeant Smith applied a vascular neck restraint; and Deputy Carballosa struck Perez in the face two or three times. See Maguire Dep. at 42, 58; Anderson Dep. at 56-59, 65-68; Smith Dep. at 111-12, 119; Carballosa Dep. at 22, 34. They maintain this level of force was necessary because Perez fled the scene and was non-compliant, combative, and resisting arrest. Perez, however, offers an altogether different version of events. He testified that he never fled the scene, that he was compliant and subdued, that he never resisted arrest at any point during the encounter, and that officers struck him after he had been handcuffed. See Perez Dep. at 31 (testifying that he did not "try and run away," that he was just "standing there" when the officers arrived, that he did not fight the police, and that he never threw anything in the pond); id. at 37 (testifying that he never resisted, that "they handcuffed us and throw [sic]

23

us on the floor and they started beating us. And that's when they started questioning us. They didn't even search me. He continued hitting me and hitting me and at some point I told him please don't kill me."); see also id. at 37 (testifying that when the police came, "I raise my hands. I get handcuffed. And [Deputy] Carballosa hit me here and the second here where he cut me.").

Viewing the facts in the light most favorable to Perez, a reasonable jury could find that Sergeant Smith and Deputies Maguire, Anderson, and Carballosa's use of force was objectively unreasonable if Perez had not fled and was indeed compliant and non-resisting or already handcuffed. That is so because the Eleventh Circuit has "consistently held that gratuitous use of force when a criminal suspect is not resisting arrest constitutes excessive force." Stryker v. City of Homewood, 978 F.3d 769, 775 (11th Cir. 2020) (quotation marks omitted); see also Saunders v. Duke, 766 F.3d 1262, 1265 (11th Cir. 2014) ("We have repeatedly ruled that a police officer violates the Fourth Amendment, and is denied qualified immunity, if he or she uses gratuitous and excessive force against a suspect who is under control, not resisting, and obeying commands."); Johnson, 18 F.4th at 1272-73. So the critical question is whether Perez was non-compliant and resisting, and at least as to this question, there undoubtedly are genuine disputes of fact. Because Perez's account of his arrest is at clear odds with that of the officers, there are credibility determinations that cannot be made at the summary judgment

stage. Strickland v. Norfolk S. Ry. Co., 692 F.3d 1151, 1162 (11th Cir. 2012) ("Where a fact-finder is required to weigh a deponent's credibility, summary judgment is simply improper."). Defendants' contention that summary judgment is proper because Perez has no evidence other than his own accusations is unavailing. The Eleventh Circuit Court of Appeals has "explicitly held that a plaintiff's 'self-serving and/or uncorroborated' testimony can be enough on its own 'to preclude summary judgment.'" Walters v. Fast AC, LLC, 60 F.4th 642, 648 (11th Cir. 2023). Indeed, it "is often the case [that] the plaintiff's evidence consists primarily or solely of [his] own self-serving sworn statements or testimony." Patterson v. Georgia Pacific, LLC, 38 F.4th 1336, 1350-51 (11th Cir. 2022). Where, as in this case, Perez has testified to matters within his own personal knowledge and his testimony supports his claims, summary judgment is inappropriate. See id. The Court simply cannot and must not make credibility determinations or weigh the evidence in ruling on a motion for summary judgment. Id.; Feliciano v. City of Miami Beach, 707 F.3d 1244, 1253 (11th Cir. 2013) (reversing entry of summary judgment in light of the plaintiff's "self-serving" but "non-conclusory descriptions of specific, discrete facts . . . based on her first-hand personal knowledge"). Therefore, Sergeant Smith and Deputies Maguire, Anderson, and Carballosa are not entitled to summary judgment based on their contention that the evidence shows they did not violate Perez's right to be free from excessive force.

For similar reasons, the Court concludes that there are genuine issues of material fact as to Perez's excessive force claim against Deputy Thurmond. While Deputy Thurmond testified that he was not present at the take-down site and could not see the encounter or Perez's subsequent arrest from where he was parked, Perez testified that Deputy Thurmond not only was present, but struck him hard. See Perez Dep. at 44. As such, Deputy Thurmond is not entitled to summary judgment as to Perez's excessive force claim against him.

Sergeant Smith and Deputies Maguire, Anderson, Thurmond, and Carballosa also are not entitled to qualified immunity. There are genuine issues of material fact as to whether Sergeant Smith and Deputies Maguire, Anderson, Thurmond, and Carballosa used excessive force against Perez. Under Perez's version of the facts, he did not flee, was compliant, was not resisting arrest, and was struck despite being handcuffed. Assuming these facts to be true, the conduct of these Defendants would have amounted to a violation of clearly established law. As discussed above, it was clearly established at the time of Perez's arrest in 2017 that a police officer is prohibited from using "gratuitous force on a non-resisting suspect who no longer poses a threat to his safety." Acosta, 97 F.4th at 1242.

In their reply briefs, Sergeant Smith and Deputies Maguire, Anderson, Thurmond, and Carballosa continue to argue that the Court should disregard Perez's deposition testimony. See Joint Reply at 2-3; Thurmond Reply at 2-3.

26

Sergeant Smith and Deputies Maguire, Anderson, and Carballosa also contend that Perez's deposition testimony is refuted by his state criminal convictions for trafficking and resisting arrest. <u>See</u> Joint Reply at 2-3. But, it is well-settled that "a successful § 1983 claim against an arresting officer for using excessive force does not necessarily negate an element of the underlying charge of resisting arrest. . ." <u>Dyer v. Lee</u>, 488 F.3d 876, 879 (11th Cir. 2007). Ultimately, the determination of what actually transpired during Perez's arrest must be resolved at trial. The jury is free to disbelieve Perez's deposition testimony, but the Court cannot disregard his testimony at the summary judgment stage. <u>See</u> <u>Stryker</u>, 978 F.3d at 777 (reversing grant of qualified immunity to officers because "Very little is clear about exactly what happened . . . The officers articulate a version of events that justifies their [said] use of force. [Plaintiff] tells a story that presents a clear constitutional violation. Resolving that dispute is for a trial, not summary judgment."). Accordingly, Sergeant Smith and Deputies Maguire, Anderson, Thurmond, and Carballosa are not entitled to summary judgment on Perez's excessive force claim.

## B. Perez's Fourth Amendment Failure to Intervene Claim

"[A]n officer who is present at the scene and who fails to take reasonable steps to protect the victim of another officer's use of excessive force[ ] can be held liable for his nonfeasance." <u>Velazquez v. City of Hialeah</u>, 484 F.3d 1340, 1341 (11th Cir. 2007) (quotation marks omitted). Here, entry of summary

judgment would be improper because there are disputed issues of fact regarding whether Deputies Thurmond and Bellamy were present at the scene of Perez's arrest, and if so, whether they were in a position to intervene on his behalf. While Perez's deposition testimony is at odds with Deputy Thurmond's testimony that he was not present at the take-down location, the Court cannot resolve this conflict in the evidence. Similarly, although Deputy Bellamy testified that he stayed in the parking lot with Perez's son and did not pursue Perez, Deputy Carballosa testified during his deposition that Deputy Bellamy not only was present, but also made physical contact with Perez. See Carballosa Dep. at 18, 33-35. In light of these disputed issues of fact, the Court concludes that Deputies Bellamy and Thurmond are not entitled to entry of summary judgment in their favor as to Perez's failure to intervene claims against them.

## C. Perez's Municipal Liability Claim

At the outset, the Court notes that "[f]or liability purposes, a suit against a public official in his official capacity is considered a suit against the local government entity he represents." Vineyard v. County of Murray, 990 F.2d 1207, 1210 n.3 (11th Cir. 1993) (citation omitted). Therefore, Perez's claim against Sheriff Hardwick in his official capacity is a municipal liability claim against St. Johns County. Notably, the Supreme Court of the United States has soundly rejected the theory of respondeat superior as a basis for liability

in § 1983 actions. See Monell v. Dept. of Soc. Servs., 436 U.S. 658 (1978).

Instead, a municipality may be liable in a § 1983 action "only where the

municipality itself causes the constitutional violation at issue." Cook ex rel.

Estate of Tessier v. Sheriff of Monroe Cnty., 402 F.3d 1092, 1115 (11th Cir.

2005) (citations omitted). Thus, a plaintiff must establish that an official policy

or custom of the municipality was the "moving force" behind the alleged

constitutional deprivation. See Monell, 436 U.S. at 693-94. "A policy is a

decision that is officially adopted by the municipality, or created by an official

of such rank that he or she could be said to be acting on behalf of the

municipality." Sewell v. Town of Lake Hamilton, 117 F.3d 488, 489 (11th Cir.

1997) (citation omitted). The policy requirement is designed to "distinguish

acts of the municipality from acts of employees of the municipality, and thereby

make clear that municipal liability is limited to action for which the

municipality is actually responsible." Grech v. Clayton Cnty., 335 F.3d 1326,

1329 n.5 (11th Cir. 2003) (en banc) (quotation omitted). Indeed, municipal

liability arises under § 1983 only where "'a deliberate choice to follow a course

of action is made from among various alternatives' by city policymakers." City

of Canton v. Harris, 489 U.S. 378, 389 (1989) (quoting Pembaur v. Cincinnati,

475 U.S. 469, 483-84 (1986)). A municipality will rarely have an officially-

adopted policy that permits a particular constitutional violation; therefore, in

order to state a cause of action for damages under § 1983, most plaintiffs must

demonstrate that the municipality has a custom or practice of permitting the violation. See Grech, 335 F.3d at 1330; McDowell v. Brown, 392 F.3d 1283, 1289 (11th Cir. 2004). The Eleventh Circuit has defined "custom" as "a practice that is so settled and permanent that it takes on the force of law," Sewell, 117 F.3d at 489, or a "persistent and wide-spread practice," McDowell, 392 F.3d at 1290.

In some circumstances, "the failure to provide proper training may fairly be said to represent a policy for which the [municipality] may be held liable if it actually causes injury." City of Canton, 489 U.S. at 390. However, failure to train can lead to municipal liability "only where a municipality's failure to train its employees in a relevant respect evidences a 'deliberate indifference' to the rights of its inhabitants [such that the failure to train] can be properly thought of as a city 'policy or custom' that is actionable under § 1983." Id. at 388-89. Thus, in order to assert such a claim, a plaintiff must "present some evidence that the municipality knew of a need to train and/or supervise in a particular area and the municipality made a deliberate choice not to take any action." Gold v. City of Miami, 151 F.3d 1346, 1350 (11th Cir. 1998); see also Underwood v. City of Bessemer, 11 F.4th 1317, 1333 (11th Cir. 2021). The Eleventh Circuit has repeatedly held that "without notice of a need to train or supervise in a particular area, a municipality is not liable as a matter of law for any failure to train and supervise." Gold, 151 F.3d at 1351. Indeed, "the

need for such training must be plainly obvious to [a municipality's] decisionmakers," such as where there is "evidence of a history of widespread prior abuse." Wright v. Sheppard, 919 F.2d 665, 674 (11th Cir. 1990); see also Rocker v. City of Ocala, 355 F. App'x 312, 314 (11th Cir. 2009) (per curiam). The Supreme Court, in dictum, has left open the possibility that in some instances "a need to train could be 'so obvious,'" that a municipality could be held liable even without a pattern of prior constitutional violations. Gold, 151 F.3d at 1352 (quoting City of Canton, 489 U.S. at 390). As an example, the Supreme Court pointed to the need to train officers in the use of deadly force where the officers are provided firearms. City of Canton, 489 U.S. at 390 n.10.

In this case, in his Second Amended Complaint, Perez fails to identify any specific policy or custom that was the moving force behind an alleged constitutional deprivation. See Second Amended Complaint at 10-11. In his motion, Sheriff Hardwick argues he is entitled to summary judgment due to Perez's failure to establish the existence of an unconstitutional custom or policy. See Sheriff's Motion at 20-23. In response, Perez appears to argue that his failure to identify a specific policy or custom is due to Defendants' purported failure to produce complete training histories and training materials. See Sheriff's Response at 13-16, 19. Perez's argument is unavailing. Perez was provided ample opportunity to marshal evidence in support of his municipal liability claim. As Sheriff Hardwick points out, Perez deposed SJCSO Deputy

31

Todd Boger at length regarding the deputies' training records and SJCSO's training processes. See Doc. 146 at 2-3. Not only that, Perez questioned each deputy at length regarding his education and training history during the individual deposition of each. He does not contend that SJCSO failed to adequately train the deputies involved in his arrest or that there was either a pattern of improper training or deficiencies in SJCSO's training program. To establish a failure to train claim, Perez must show that "[St. Johns County] inadequately trains or supervises its employees, this failure to train or supervise is a [St. Johns County] policy, and that [St. Johns County's] policy causes the employees to violate [an inmate's] constitutional rights." Gold, 151 F.3d at 1350. Absent factual allegations to support any of the above, Perez's claim for relief based on a failure to train fails. In sum, Perez simply has not raised a genuine issue of material fact in support of his claim that St. Johns County should be subject to municipal liability under § 1983. Thus, his municipal liability claim is due to be dismissed with prejudice.

**D. Perez's Battery Claims**

The resolution of Perez's state law battery claims against Sergeant Smith and Deputies Maguire, Anderson, Carballosa, and Thurmond is "inextricably intertwined" with the resolution of his excessive force claims. See Kirby v. Sheriff of City of Jacksonville, Fla., No. 22-11109, 2023 WL 2624376, *6 (11th Cir. Mar. 24, 2023). Indeed, the Eleventh Circuit has explained:

> In Florida, battery has two elements: (1) "inten[t] to cause a harmful or offensive contact," and (2) a resulting "offensive contact with the person of the other." <u>City of Miami v. Sanders</u>, 672 So. 2d 46, 47 (Fla. 3d DCA 1996). In the arrest context, "[a] battery claim for excessive force is analyzed by focusing upon whether the amount of force used was reasonable under the circumstances." <u>Id.</u> "If excessive force is used in an arrest, the ordinarily protected use of force by a police officer is transformed into a battery." <u>Id.</u> But, "ordinary incidents of [an] arrest . . . do not give rise to an independent tort." <u>Lester v. City of Tavares</u>, 603 So. 2d 18, 19-20 (Fla. 5th DCA 1992).

<u>Baxter v. Roberts</u>, 54 F.4th 1241, 1272-73 (11th Cir. 2022). Because the Court finds that there are genuine issues of fact that make entry of summary judgment improper in favor of Defendants as to Perez's excessive force claims, the Court similarly finds that entry of summary judgment is improper as to Perez's state law battery claims against Sergeant Smith and Deputies Thurmond, Carballosa, Maguire, and Anderson.

Summary judgment also is not proper as to Perez's battery claim against Sheriff Hardwick in his official[13] capacity. Under Florida's limited waiver of sovereign immunity, a municipality may be sued for torts committed by its employee within the scope of his employment as long as the employee did not act "in bad faith or with malicious purpose or in a manner exhibiting wanton and willful disregard of human rights, safety, or property." Fla. Stat. §

---

[13] There is no evidence suggesting that Sheriff Hardwick was present at the scene or otherwise personally involved in Perez's arrest.

768.28(1), (9)(a); see Richardson v. City of Pompano Beach, 511 So. 2d 1121, 1124 (Fla. 4th DCA 1987). Because genuine issues of material fact remain regarding the Deputies' and Sergeant Smith's use of force, the Court finds there are also genuine issues of material fact as to whether they acted in bad faith, maliciously, or with wanton and willful disregard for Perez's rights. See Butler v. Gualtieri, 41 F.4th 1329, 1340 (11th Cir. 2022) (noting that it is not the district court's role "to wade into the remaining factual disputes and make determinations regarding the witnesses' credibility, let alone draw appropriate inferences from the proffered facts"). As such, the Court cannot resolve Sheriff Hardwick's claim of immunity at this stage of the proceedings, and thus, summary judgment is due to be denied on this issue. See McGhee v. Volusia Cnty., 679 So. 2d 729, 733 (Fla. 1996) (explaining that sheriff is only immune in very limited circumstances, and concluding that issue of whether deputy acted in bad faith, with malicious purpose, or in manner exhibiting wanton or willful disregard of human rights, safety, or property when he kicked handcuffed plaintiff presented question of fact for the jury).

Accordingly, it is

**ORDERED:**

1.   The Clerk of the Court is directed to file the Court's Corrected Second Amended Complaint on the docket as the operative Complaint in this action.

2.      Deputy Bellamy's Motion for Summary Judgment (Doc. 131) is **DENIED**.

3.      Deputy Thurmond's Motion for Summary Judgment (Doc. 132) is **DENIED**.

4.      Deputies Carballosa, Maguire, Anderson, and Sergeant Smith's Motion for Summary Judgment (Doc. 133) is **DENIED**.

5.      Sheriff Hardwick's Motion for Summary Judgment (Doc. 134) is **GRANTED** as to Count III, Perez's municipal liability claim against Sheriff Hardwick, and **DENIED** as to Count V, Perez's battery claim against Sheriff Hardwick.

6.      Count III of Perez's Second Amended Complaint, Perez's municipal liability claim against Sheriff Hardwick, is **DISMISSED WITH PREJUDICE**.

7.      On or before **August 16, 2024**, counsel for the parties must confer

and file a joint notice advising the Court whether the parties believe a settlement conference before the assigned Magistrate Judge would be beneficial.

**DONE AND ORDERED** at Jacksonville, Florida, this 24th day of July, 2024.

MARCIA MORALES HOWARD
United States District Judge

Jax-10  05/23
C:      Counsel of record